This is case number 4-13-0360, okay, Eric Yerpe? Am I saying that correct? I'm Eric Yerpe, Jherpe. Jherpe, okay. Let's see, versus Thomas, let's say? Roland Thomas. Roland Thomas, okay. For the appellant is Attorney Wahl, and for the appellee is Attorney Anderson. All right, you may proceed. Thank you, Your Honors. May it please the Court, Counsel, my name is Dawn Wahl, and I actually am appearing on behalf of Roland Thomas and Donna Thomas. In the trial court, they have a couple of different capacities because they were named defendants in a case, and then Ms. Thomas actually filed a plaintiff's case as well as Mr. Thomas. We are here before Your Honors today, as you're aware, on a sanctions order that was entered by Judge Beeney in March of 2013, following a discovery dispute between the parties. This is a unique case in that there are mandatory arbitration provisions in an integrated business agreement that was in existence between Eric Yerpe and Mr. Thomas. The parties initially were partners together in an accounting firm. The parties had entered into a business agreement to transition the management and ownership over time between Mr. Thomas and Mr. Yerpe. Mrs. Thomas was an employee of that firm. In November of 2011, it is alleged in the pleadings, and I think agreed by the parties, that Mr. Thomas was locked out of the accounting firm as a consequence of the alleged mishandling of a request for information that had been received by the accounting firm requesting information on various clients of the accounting firm. As a consequence of the receipt of that document and the handling by Mr. Thomas, Mr. Yerpe chose to lock Mr. Thomas out of the office. This occurs in November of 2011. The parties, essentially the principal parties, file competing complaints against one another, seeking injunctive relief at the trial court and seeking various alternative relief. Judge Drzeski makes a determination that because of the arbitration clause in the business agreement, Mr. Yerpe and Mr. Thomas are required to submit their matters to an arbitrator. Donna Thomas was an employee of the firm and was not a party to the arbitration proceeding, and therefore her law case that was filed continued to remain. Those cases were consolidated, and as a consequence, the parties, through their counsel, reached agreement that the trial court would maintain jurisdiction of the discovery issues because some of those issues in the arbitration proceeding would overlap in the law case where Ms. Thomas was a party. In addition to reaching agreement that the trial court would retain jurisdiction of the discovery issues, the parties also entered into an agreed discovery schedule order that was proposed and entered by Judge Drzeski in September of 2012. And under the provisions of that agreed order, we did agree to exchange initial written discovery interrogatories and requests to produce between each other in September of 2012. We also specifically scheduled depositions of employees of the accounting firm. Two of those depositions occurred in September of 2012, and during the course of that deposition testimony, it was determined that there had been some publications of what we believed, and I think I can say we, myself, and counsel for Mr. Yerpe, believed might be confidential or proprietary information of clients or of the actual accounting firm. As a consequence of that, and also as a consequence of some communications that my client sent to clients of the office in September of 2012, counsel and I spoke. And counsel and I determined that it might be best to still the waters by each side, reaching some kind of a comprehensive agreement whereby the parties would not publish or disclose outside of the litigation and outside of the lawyers and the parties information. Counsel and I had multiple conversations. Your honors will know from the record that there are a couple of conversations documented and then follow-up communications subsequent to those conversations. I think that the particulars of those conversations are relevant to the ultimate determination that Judge Feeney makes with regard to imposing sanctions on Rolantoma. And I am here before your honors today seeking relief of the monetary sanctions issued against Rolantoma. I certainly understand that the standard here is that I need to demonstrate that Judge Feeney abused his discretion in awarding the monetary sanctions. And I have cited in my brief multiple cases for your honors, three of which are from the Fourth District, dealing with various sanctions imposed by the trial courts on litigants given particular situations. Most of those cases deal with the dismissal of an action and the appellate court weighing whether or not that was an appropriate sanction under 219. What is the purpose of sanctions? The purpose of sanctions, your honor, I think is specifically to coerce or compel a party to perform in a particular way in the event that they refuse to do that. And it's certainly not to punish a party. And your argument would be that this sanction, some $5,000 in an award, was not imposed as coercion or to compel but as a penalty? Yes, your honor, I would. So it would be punitive? It was punitive in my opinion because it arose after the initial hearing on a motion to compel. And I think we are differing in our opinions of exactly what was considered on the motion to compel. But on the day of the motion to compel hearing, March 1st, when Judge Feeney indicated that because both parties were off the discovery schedule calendar, we should have sought relief from the court sooner. And because we didn't, those dates had now expired and both parties had not done certain things. Immediately that day in the courtroom, both counsel agreed to do an amended discovery schedule. And we chose specific dates when discovery was going to be exchanged. We chose specific dates when parties were going to be deposed. And I would assert to your honors that we cured the issue that brought us before the court on the motion to compel. The motion to compel Mr. Toma and Mrs. Toma to provide their discovery responses to opposing counsel. Prior to that time, we had not turned over that information because I was acting under the understanding that we had at least had dialogue about the need for a protective order. Initially, both lawyers agreed that a protective order would be a good idea. And in fact, in the hearing on March 1st, Mr. Anderson says, I did initially agree that a protective order would be appropriate. I then subsequently thought about it and decided that it might not be the best vehicle for my client. But we certainly had initially a commitment by counsel that the parties were going to mutually agree to a protective order. And then after the entry of the protective order would provide each side's discovery responses. That protective order ultimately did not get worked out by agreement of the parties. So as I understand your argument, counsel, a discovery schedule had been agreed upon by the parties and the attorneys prior to the sanctions being imposed? Yes, certainly at the outset with Judge Drzeski in a case management conference. We had agreed in September of 2012, I think it was September 11th, 2012. We had agreed to a scheduling order in open court. And we had agreed within 10 days of that we would exchange our written discovery questions. And then by October 31st, we would provide each other with answers. We also agreed to schedule depositions of a couple of witnesses in September. And then the party depositions November 5th, 6th, and 7th, I believe. So we most certainly agreed to that order. I think we might be asking, though, about the curing. The curing in open court, March 1st. Yes, your honor, if I misunderstood that question. We did both reach agreement as to a modified scheduling order. And in that modified scheduling order. Before or after the request for a protective order was denied? Yes, the request for a protective order was denied. And then when did this curing take place? Exactly the same day. In open court with Judge Feeney. And in fact, he entered the order that particular day. So he says at the... Well, if you've got an agreement on discovery, how could the sanctions coerce or compel? Since you've already reached a court on providing or doing depositions and changing a written discovery. Well, what Judge Feeney found, I believe, in the March 27th hearing, which was strictly a sanctions hearing, is that Mr. Anderson had to file a motion to compel on behalf of Mr. Jerby. And that we were both beyond the deadlines in the earlier discovery order as a consequence of this issue of dispute about the protective order. But Judge Feeney found that one of us, primarily me probably, should have come to the court sooner and sought relief about the protective order. So Mr. Anderson would not have had to proceed on his motion to compel. So Judge Feeney says, you know, the motion to compel had to be filed. I found that you did not have substantial justification to await a protective order. Judge Feeney basically said, counsel, you should have given up all of the discovery and then sought a protective order after that discovery had been provided. I lost that particular argument in front of him on March 1st as to the need or the veracity of the protective order. Once you reach the point of saying, look, we're not going to go forward with this discovery, these depositions in November, I think what Judge Feeney was saying is that before you reach the point of refusing to go forward with what had been agreed to, there should have been some court action on the idea of a protective order. You knew that that was at issue. I think he's interpreting that, yes, Anderson originally said, yeah, maybe we do need this and maybe we can get one agreed to. But it seems to me that it would become pretty clear between September and November that nothing had happened. So you're put in the position of, hey, wait a minute, we're not going to do what we agreed to do and were ordered to do because we still haven't worked out this protective order. But it seems to me it ought to have been clear at that point that that wasn't going to be worked out. He didn't want to do it anymore. I don't know if that's the way Judge Feeney was thinking of it, but it seems it might have been. Well, I would agree with Your Honor, except then at the sanctions hearing, he specifically finds on page 37 of that transcript that he's not imposing sanctions for my failure in any way to address that protective order. It's more just delay in general? I believe that it is, and in fact, I believe it goes one step further in that counsel asserted to Judge Feeney that I had unilaterally cancelled those depositions, in particular the ones set on November 19th and November 20th. Those folks were not even my clients. And so by agreement of Mr. Anderson and myself, we had said we're not going to depose the parties who were scheduled for November 6th, November 7th, maybe November 5th. Those people who were not your clients, they had their own counsel? Exactly. Those were individuals who were the subject of the CID. They were represented by Hinshaw Culbertson. Did their counsel object to proceeding on the depositions? Absolutely. To both you and opposing counsel? Yes. Now I will indicate to Your Honor that I was not in the room when Mr. Anderson had his conversation with Charles Schauert from Hinshaw Culbertson, but he clearly had a conversation with him on October 30th. I then had about a one-hour conversation with counsel, and I don't believe this is outside the record because it was commented on at the sanctions hearing, and it also is recited in Mr. Anderson's bill that he sought relief for, which he indicates that he billed for a conversation with counsel from Hinshaw Culbertson that represented these people. I then had this lengthy conversation with Mr. Anderson on October 30th. Our discovery is to be exchanged October 31. I again indicate to him that we have this need for the protective order, and that I now have an issue with my client because I told him before we're not going to produce anything without it, and now it's an issue. It continues to be indicated to him on November 19th that I would still like to have that worked out. And I agree, Your Honors, in hindsight, maybe I should have rushed to the courthouse between November 19th and December 4th when the motion to compel was filed. I believed that the protective order was my substantial justification to not respond to the discovery. But had you filed a motion for protective order? Not at that point, Your Honor, I had not. I did provide counsel with a proposed order, and then when we were both set before Judge Foley on December 27th, I brought the protective order to the court because I've had instances where judges have just entered protective orders sua sponte, without motions, particularly if there are ongoing discovery disputes. So I was marshaled with that particular protective order when we went in front of Judge Foley. That ended up being only an in-chambers conference, and the case was moved to Judge Feeney. And then between the time that the case was before Judge Foley and moved to Judge Feeney in February, I did go ahead and file a written motion for the protective order because at that point in time it was very clear that we had exhausted any efforts at trying to get that reached and worked out. Prior to that time... Well, I think it was pretty clear Judge Feeney was disturbed that you were asking for a protective order when it was your client who had disclosed disparaging information. Isn't that true? That is true. I would never put into the pleadings. That letter was brought to open court on March 1st. And had I known that, I could have tendered the discovery depositions of the other witnesses because there was enough outside communications going on by all parties, and that was the reason counsel and I had initially agreed to still all of the disdain between these parties. We need to actively reach out to our clients and muzzle both of them. It certainly was not intended to only be a unilateral protective order. And then on the heels of the March 1st hearing and we reach a means or an agreement to cure what the delay has been, then we're sanctioned three weeks later as a consequence of what I believed Judge Feeney felt was unilateral cancellation of the discovery. I would assert to your honors that I think the record very clearly indicates that was done by agreement of Mr. Anderson. He may say, well, I would have preferred not to do that, but the Friday preceding those dates, we had agreed to cancel our party depositions because neither side had the discovery. And then I didn't have the ability to produce the other folks. And I would point out to your honors that counsel indicates that they were subpoenaed for depositions at my office. That's not true. The subpoenas that were served on these folks that were directed to the Henshaw firm after they were served required their appearance before Judge Drzeski on November 19th and November 20th. They were not scheduled to appear at my office for depositions. I think that's certainly what counsel had contemplated, but as soon as I received those subpoenas, I received a phone call from their counsel that they were not going to appear and then we on November 16th, the Friday preceding those depositions, had agreed we could cancel the party depositions, which I did have control over. And in fact counsel agreed to do that on Friday so that we both could notify the court reporter so the court reporter didn't make a trip. And then subsequently I indicated in my letter that I wasn't going to acquiesce in those depositions of those other parties because their counsel had told me that they were not going to be appearing and that they had notified Mr. Anderson. So I certainly believe in hindsight, could I have been more proactive in seeking relief with the court on the protective order? I would assert to your honors, in hindsight certainly. Should I have been a better record keeper of the communications between the lawyers so I knew exactly the day when all communications had broken down about that protective order? Most likely. But in this circumstance, when Judge Feeney awards $5,400 in fees assessed against my client and costs and says it's not as a consequence of the protective order, then I have to look at what other conduct there was. And we were off the discovery schedule clearly. Both parties were. But we cured that on March 1st by agreement and we moved forward on that plan. In my opinion, no sanctions would be appropriate because there wasn't anything left to coerce. But certainly if that's the standard, then perhaps an appearance or attorney's fees for the actual filing of the motion to compel that brought us to March 1 would be a limited recovery. But in this instance, I do believe that Judge Feeney's sanctions were punitive to the party as opposed to by design under 219. Thank you, Ms. Wall. Thank you. Mr. Anderson. Good morning, Your Honors. I'm Bill Anderson. I represent Eric Chirpy in this matter. And I've got a little bit of a different take on what was happening in this case and what Judge Feeney's thoughts were. To be honest, I think, Judge, I apologize, I don't know how to pronounce your last name. Connect. I think you were pretty much right on the ball in your analysis of what was going on. Judge Feeney was upset that Ms. Wall had unilaterally canceled these depositions and unilaterally decided not to comply with discovery without filing anything with the court because of the fact that she was not going to do this stuff without the entry of a protective order. And the reason that she wanted a protective order was because of her own client's letter that got sent out on September 24, 2012. She talks about my client publishing stuff to the public, etc. My client, as Deb admitted, that he had shown a couple of people, I believe, the CID, it's called, a request for information that came from the federal government that had been redacted to the point where all it had on there was Mr. Toma's name. And he did that only in response to being questioned by former clients or clients that were hearing a different story from Mr. Toma than they were hearing from Mr. Jerby. And they were basically calling Mr. Jerby a liar and saying there was no CID from the government that they had heard. And in defense, he finally said, well, here's the just information coming to an accounting firm request from the federal government. It was information being requested of the accounting firm regarding clients of the accounting firm. And one of the corporations whose information was being sought, Mr. Toma had become involved in the corporation ownership-wise with the client. So Mr. Toma had a personal conflict, an ethical personal conflict dealing with this information request from the federal government or at least he had an issue there because he was personally involved. What does that have to do with what we're talking about? Well, I'm just going back to the original story of the case so you understand what the case was. Actually, I don't think it has anything to do with what we're talking about. Two CPAs don't like each other anymore and one of them thought one of them screwed the other. Right. And they got a divorce. They're accountants. They're doing business together. They're getting a divorce. And so we're in the courts. And I never agreed to cancel the dates. Bottom line. What happened is the letter went out. It was a scorch the earth letter. Judge Feeney called it spewing bad faith all over the place on page 16 and somewhat shocking to the court on page 25 that he would do it. I called Dawn Wall on the 27th three days after the letter went out and explained to her that the letter had gone out. I told her I didn't know if she had seen it before but I wanted her to know what her client was doing. That it was definitely damaging the business which my client is supposed to be buying from her client. And Ms. Wall, I think her response was somewhere in the conversation, well we should have some sort of order protecting, you know, stopping this. And my initial response was yeah, we got to stop this. This is bad. You know, my client's going crazy. Well, you know, after a couple of days of weather and the storm and talking to my client I changed my mind. And I let Ms. Wall know that. That I didn't want a protective order. That right now I thought that basically Mr. Thoma had shot his wad and he'd thrown out all the bad will he could. And I didn't know what my client would do in the future to defend himself or if anything but I didn't feel his hands should be tied. And that at this point a protective order would probably damage instead of aid my client. Did you communicate that to Ms. Wall? Absolutely, Your Honor. And I absolutely refused. It was within I know that it was in late October and early November that I was communicating this to Ms. Wall. Because I was absolutely refusing to see a protective order. I never saw, she said she gave me one on October 30th. I never saw one on October 30th. I never saw a protective order in this case until it was until it was mailed out on I don't know, 27th of February, something like that before the March 1 hearing. It certainly wasn't given to me on October 30th. I didn't agree to it. I was upset with Ms. Wall. I was talking to her on the phone on Friday November 16th. She was telling me she was canceling the deaths. She wasn't going to have her clients appear. I sent out these notices for deaths. Maybe my office put in the courthouse and Judge Drzuski on the notice. I didn't even know that until this morning. That could have easily been a mistake I made. I don't know. But my understanding was all the deaths were set at Ms. Wall's office. And that's where all the deaths were supposed to be. That's what the court order had laid out. We had all these dates the deaths were supposed to happen. I had noticed them up for Ms. Wall's office. Ms. Wall calls me and says she's canceling the deaths. She's not producing the clients. She's not producing the discovery. And, you know, what can I do when all these people are supposed to be at her office is what my understanding was. Did you agree that some of them have other representations than her clients? Sure. Some did. And I had talked to another attorney about one or two of the people showing up for deaths and conflicts and things. But I hadn't heard from all of them or talked to all of them. Well, was she sanctioned for not producing witnesses that were not under her control? No. I don't believe so. I mean, I think Judge Feeney well understood. Well, how did Judge Feeney come up with $5,400? I mean, I don't have the breakdown. Well, I've got the attorney fee breakdown. I mean, there were $15,000 in attorney fees spent working on this whole thing and asked for it. He questioned counsel, went back and forth and he cut it down to $5,400 is what happened. And that was actual time that was spent trying to get this discovery done. Okay. So it wasn't for preparation of the depositions? Actually, I had two days of preparation over the week. See, I contacted her on Friday and asked if she had a report. So those two days I think were not even included because I said I could use them later. Okay. So that preparation over the weekend is not part of the $5,400? That's my understanding. I don't want to mislead you, but I know when I was arguing before Judge Feeney that I told him that I did not include that weekend in the bill. And I don't think it was included in the final bill. It could have been. What's your response to the argument that these sanctions were punitive? They were to compel or coerce because there was already an agreement reached as to how the discovery was going to be handled. There was no agreement on how it was going to be reached. We went in there with Don Wall refusing to produce anything because there was no protective order and demanding a protective order. So the first thing Feeney did was he started hearing the case. He denied the request for protective order. Then he ordered a new schedule to be prepared. And counsel and I drafted the new schedule and entered it. And then he moved on to the sanctions, I believe, to coerce and enforce and make sure that that new schedule was then followed. You may have to go clear back to this case. I mean, I remember the words at some point in these hearings, the words classic obstructionism by Judge Feeney being used. And this discovery was supposed to be filed by September 17th in the written order of 2012. And that was all entered because it wasn't getting done from the case that was filed in November of 11. But you didn't comply with discovery either. Well, I'm getting to that and I'll explain why. Because we were supposed to file on 17th. Counsel and I talked and we both agreed not to do it until the 21st to give each some more time and we're preparing it. I'm talking to counsel. She's saying, okay, I'll get mine to you on the 21st. You'll get it to me. We're all agreeing. I send mine over on the 21st. I don't get hers. I got it a week later. And so she's got mine there for a week when she says she's not going to look at it or whatever to help prepare hers. So then mine's due a week after hers. Then she's telling me she's not going to send it to me. I can produce mine, but I get to the point where yours is due first. I want to get yours. There's no motion to compel requiring me. There's just one the other way. And I would freely admit that I was getting tired of getting jerked around and if they weren't ever going to comply with their discovery, which was due a week before mine, I'd have probably given them mine. And so I file motions with the court and I bring all this up before the court and that's the rest of it. But I strongly disagree with some of the assertions by counsel. You know, on Friday, I'm telling her, she's telling me verbally she's canceling it. And I'm advising her that the depositions were set pursuant to court order unless we receive written confirmation from her that she's not going to be doing them, I'm going to show up. 747 in the morning on the day of the deaths, I get written confirmation from her that she's not responding to discovery, she's not producing her clients, and she's canceled the deaths of the other people is the way I interpreted that correspondence. And she did make mention of them having other attorneys and stuff like that in that letter too. Well, if the discovery was late in September, and you knew, or not late, but not exchanged at exactly the same time. Right. And you knew she still wanted a protective order, even though you had thought at that point the scorched earth meant that why not? Let's just, we'll each each side might end up airing dirty laundry. When was the motion to compel filed? Let's see, my motion to compel was filed on December 4th. Well, what happened in October and November? I mean, I know in November is part of the time that we know. Well, you remember November 19th and 20th were the deaths. Yes, we know that. And so, it took me about two weeks to get the motion to compel on file after the deaths were You're already engaged in a discovery dispute with the other side. I still had hopes for getting, I mean, I'm still talking to Dawn while I'm still trying to get this discovery from her. I'm still getting promises. On October 30th, I'm told her I believe it was October 30th we had a court date. And on that date, I'm told in court that she's got her secretary date stamping all the discovery for me and it will go out that day or the next day. But right now at the office as we speak, the secretary's back there date stamping stuff. A few weeks later, the story I get is I don't have it. It's not ready. It's not done yet. When two weeks earlier, I was told it was all done and the secretary's copying and date stamping everything to send to me. And so, that was part of how all these fees got going up is that I'm still working and trying to get this stuff done. I mean, counsel and I aren't really fighting over this stuff as much as we're trying to be cooperative and work together. We've got different interests, obviously, but we're trying to get this done. And finally, it became very you know, after the deaths were canceled and all this stuff, it became very apparent that I wasn't going to get any cooperation and that's why I filed a motion. And I think Feeney was definitely trying to make sure that this discovery orders started being complied with. And that was why he entered specific orders and that's why he assessed these sanctions. I think he also felt that some of these expenses that were incurred should be Mr. Thoma's expenses instead of Mr. Cherokee's expenses because of the actions of counsel and Thoma. And I think that's appropriate. Counsel suggested that if sanctions were appropriate at all they should have been to cover attorney fees for pursuing the motion to compel. What do you think about that? I think there's some argument there. It's all kind of combined. Are you agreeing then that Judge Feeney's order went beyond that? No, it didn't. I don't think there's anything inappropriate in Judge Feeney's award. I think that he gave me the fees that were appropriate for the discovery violations and the expenses. I just don't see how he calculated those without being punitive. I guess that's my problem. I'm sorry, what did you say, sir? How did he calculate those unless they were calculated in a punitive fashion? Well, I think he just went through my time and itemized and questioned me quite a bit on my time. How did he come up with it? That's what I'm trying to ask you. I mean, in general, you're saying he went through your time. Can you be more specific? Yeah, I can pull out my bill. I think I've got it here with me today. I was looking through the file and I think I saw it. I don't... I guess I've got the itemized bill with all the time itemized. I don't know what I do with it at this point, Your Honor. In other words, I can start reading your time. Your argument, I guess, is that Judge Feeney went through the bill and decided what was appropriate to consider in determining sanctions and what was not. Correct. We just don't know exactly what his thinking was. Probably not, if that wasn't all clearly made part of the record. But my bill was... I don't know if my bill came to you as part of this transcript with the exhibits and things like that. I certainly would have no problem submitting it, but I just assume when you get the full record you've got the full record in the case and that it's in there. I don't know. Aren't I allowed to talk about what's transgressing in this ongoing case beyond this point? Or are we limited here? I've got further arguments to make, but I don't want to cross a line. You know what I mean? This is an ongoing case and to me it's an ongoing problem. These are not the only sanctions that have been awarded. Well, I'm going to state an objection to that. It's outside the record and no decision has been made yet. I've received a decision. Alright. Well, I'm going to sustain that objection if it's not worthy for us. I understand. So, Mr. Anderson, I think Justice Turner's concern is you know, what were the penalties if he's awarded for other than appearing on the motion to compel? Which would seem to me maybe you'd have an hour or so in preparing the motion, an hour in court. Okay. Well, you know, I'm looking at a bill here and it starts October 26th. For instance, this particular one. Email to Don Walray, status of outstanding discovery, point file. Five. Email from Don Walray, discovery, point three. Email from Don Walray, protective orders, telephone call to Don Walray, telephone conference with client, return call to Walray, advice we will not agree with protective order. 1.2 hours on October 30th, 2012. So there's your answer to October 30th. When did I tell her we won't agree to a protective order? It's in my bill dated October 30th. November 1, receive email from client. November 1, two telephone calls to client. November 1, receive text from client. November 1, conference with client. Let me interrupt you because I'm getting the flavor of it. Aren't some of those things the back and forth that occurs anyway when you're conducting litigation? As opposed to you coming in on a motion to compel because you're not getting your responses to discovery and depositions are being canceled. I agree with you that these could be about other things, but these were all about, this was all about the hot button of what was going on right then, which was this refusal to comply with the discovery, the letter that had gone out, their desire for a protective order. Then I have draft notice of discovery deposition for Donna Tolman. Telephone conference, rated discussions, and depth discovery with Ms. Wall. Several emails to and from the client. Draft notices for depositions. Amend and file with the court. Send all copies. Send a copy to Don. Telephone call with client. Rescheduling the depths. Email from client. Subpoenas and discovery. Draft 201K letter to Don Wall. Telephone call to client rate status. I hate to interrupt you, but you're out of time. It could go on forever. It's pages. Thank you. Ms. Wall, any rebuttal? Both counsel have received questions about the timeline, and I think it is significant in this particular case, and counsel just indicated, when I indicated to your honors, October 30th, we had a very lengthy phone call, almost an hour, to try to work out the discovery issues. And an email talking about, again, still the protective order, and on that particular day, that's when I believed that kind of communications had broken down. But many of the entries in Mr. Anderson's bill, he tendered a bill to Judge Feeney for almost $15,000 for this particular discovery dispute. I have no ability to know what Judge Feeney included in reaching that $5,400. I did specifically, at the hearing on March 27th, object to Judge Feeney including things like all these conversations that counsel and I had to try to work out the issues, and in fact, even the 201K letter, because in accordance with Supreme Court rule, we're supposed to try to fetter those things out amongst ourselves, and not have fees imposed on us to try to do those things. So I would assert to your honors that if there was any misstep by the party in this case, or by counsel for the party in this case, it was that I didn't beat Mr. Anderson to the courthouse on December 4th. I didn't file my motion for protective order until we were at issue on his motion to compel. But Judge Feeney clearly, in my opinion, posed punitive punishment money damages against Mr. Thoma as a consequence of the cancellation of depositions that were not even of my people that I controlled. And that was agreed to by counsel. It was agreed to him when it related to the party depositions on November 6th, 7th, and 8th. And it was agreed to by him on November 16th. Consequently, prior to the start of business the next Monday, that was on a Friday when he agreed, and prior to the start of business on Monday, I sent a letter confirming all of that so that we hopefully didn't end up here. So I would ask your honors that in this particular instance, I do believe that the monetary damages awarded by Judge Feeney were not punitive, and that it was an abuse of discretion. Mr. Anderson has cited cases that say the trial court weighs the credibility of witnesses. Of course, that's something we all understand. There were no witnesses at this hearing, though. So is he suggesting that Judge Feeney weighed the credibility of the attorneys arguing in front of him? Is that what I'm to glean from these cases regarding credibility of witnesses? What I gleaned from his citation to that was that Judge Feeney read this letter in open court that wasn't part of the pleading. In fact, it wasn't even tendered to the court to be considered. And Judge Feeney, I believe, judged the credibility of that letter, or the appropriateness of that letter, and he punished Mr. Thoma as a consequence. And his means to do that was sanctions. That's what I believe was credibility. Well, it was given to him in open court, your honor, by counsel, unbeknownst to me until I arrived there. And then at the end of the discussion on March 1st, I think Judge Feeney even says, well, I'm going to give this back to you. It's not going to be part of the record. And I certainly didn't want it in the record at that point, because I had been working to try to marshal everything. I do want to raise one point about the scheduling order. We did collaborate on that scheduling order in open court on March 1st. It wasn't a situation where Judge Feeney ordered me to leave the courtroom and he was going to enter an order. We all collaboratively agreed on those new dates for that new scheduling order. That's why I would assert that we did cure the issue on March 1st. Well, Mr. Anderson is arguing, though, Judge Feeney wanted to make sure this time it was complied with, and so that the sanctions he imposed were like, hint, you better comply with it this time or there will be more sanctions in the future. Therefore, it was to compel. Well, but in that same instance, he indicates to me that my justification for holding back on that discovery, though I lost the issue before the court, was appropriate. He says that on page 37 that I shouldn't be punished because I asserted that issue. I then learned on March 1st that he was going to deny my request for protective order, and I immediately agreed to a scheduling order that got us right back on track, Your Honor. On that basis, I do believe that it was punitive. Okay, just to get back to the question I raised a couple of minutes ago. You don't think counsel is citing the credibility of witness case to suggest to this in any way the credibility of the attorney arguing in front of you? Well, we weren't witnesses. I mean, I guess we can make admissions on behalf of our clients, Your Honor, but I truly believe that the information that Judge Feeney was asked to consider and evaluate was in the record in the form of pleadings. Okay, thank you, counsel. Thank you.